**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

MICHAEL S. McLAUGHLIN,      )
         )
         )
         Plaintiff,      )     Civil Action No. 12-893
         )
     vs.          )     Judge Nora Barry Fischer
         )
MICHAEL J. ASTRUE,      )
Commissioner of Social Security      )
         )
         Defendant,      )

**AMENDED MEMORANDUM OPINION**

## I.     INTRODUCTION

Michael S. McLaughlin ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying his application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 – 1383f ("SSA"). This matter comes before the court on cross motions for summary judgment. (Docket Nos. 8, 10). The record has been developed at the administrative level. For the following reasons, Plaintiff's Motion for Summary Judgment is DENIED, and Defendant's Motion for Summary Judgment is GRANTED.

## II.     PROCEDURAL HISTORY

On April 3, 2008, Plaintiff applied for SSI, asserting disability beginning January 1, 1999. (R. at 51).[1] Plaintiff alleged that he suffered from asthma, back pain, depression, social anxiety and mood swings. (*Id.*). This original claim was denied on June 13, 2008. (*Id.*). Plaintiff appeared and testified at a hearing held on April 27, 2009, where an impartial vocational expert

---

[1] Citations to the Record, *hereinafter*, "R. at __".

also appeared and testified. (*Id.*). On August 3, 2009, the Administrative Law Judge ("ALJ") determined Plaintiff had not been under disability within the meaning of the SSA. (R. at 64).

Plaintiff applied a second time for SSI shortly thereafter on September 21, 2009, claiming a disability onset of September 21, 2009. (R. at 10). Again, Plaintiff was denied his request on December 8, 2009. (R. at 67). Upon a written request, Plaintiff attended a hearing on December 6, 2010 where he testified, assisted by counsel. (R. at 10). An impartial vocational expert also appeared and testified. (*Id.*). On January 25, 2011, the ALJ issued his decision denying benefits to Plaintiff. (*Id.*). Plaintiff then filed a request with the Appeals Council, which was denied on June 6, 2012, thereby making the judgment of the ALJ the final decision of the Commissioner. (R. at 1).

A complaint was filed in this Court by the Plaintiff on June 28, 2012, seeking review of the Commissioner's decision to deny Plaintiff's previous claim. (Docket No. 3). Defendant filed his answer September 10, 2012. (Docket No. 5). Plaintiff then filed a Motion for Summary Judgment on September 21, 2012, (Docket No. 8), followed by Defendant also filing a Motion for Summary Judgment on October 30, 2012, (Docket No. 11).

III.   **STATEMENT OF FACTS**

A.   *Plaintiff's General Background*

Plaintiff was born on December 23, 1979, making him thirty-one at the time of his administrative hearing.[2] (R. at 28). As a child, he had been abused by both his mother and his stepfather. (R. at 194). He also experienced difficulty and physical torment from his peers. (*Id.*). He has two siblings, neither of whom has any contact with him. (R. at 194). One of his brothers has a PFA against Plaintiff and his mother. (R. at 368). Although Plaintiff dropped out of school during the ninth grade, he obtained a GED in 2005. (R. at 268). He later started school at ITT

_____
[2] Plaintiff is a "Younger Person" Pursuant to 20 C.F.R. §§ 404.1563, 416.963.

Tech, but quit after approximately one year because he lost his financial aid. (R. at 223). Plaintiff last held a job for four months in 1999 working the grill at McDonalds before quitting because he did not like dealing with the other employees. (R. at 169). Prior to his work at McDonalds, he had been employed five other times, each for only a brief period during 1995, 1996 and 1998. (R. at 149, 184). He then subsisted off of disability payments for nine years before his assistance was taken away in 2008. (R. at 268). At the time of the hearing, Plaintiff was again living off of welfare assistance. (R. at 30).

During a typical day, Plaintiff claims that he stays inside, while walking around thinking about how much he hates other people and his own life. (R. at 163-164). He lives with his mother, who has stated that she intends on taking care of him for the rest of her life. (R. at 260). He does not associate with any friends and primarily stays on his computer. (R. at 167). A neighbor had been bullying him, but his mother obtained a Protection From Abuse order against that person. (R. at 269). He cares for a pet by feeding it and cleaning its cage. (R. at 164). Plaintiff has never had a driver's license, but his mother drives him as needed. (R. at 166). In the past, he smoked marijuana because he believed that it helped to relieve his anxiety (R. at 265), but he claims that he quit about a year prior to the hearing. (R. at 36). He was able to purchase the drugs using money he was provided through welfare. (*Id.*).

   B.   *Plaintiff's Medical History*

Plaintiff claims that he began having lower back pain following a car wreck in 2001. (R. at 171). He describes the pain as sometimes severe and said that it is triggered most by bending, lifting and squatting. (*Id.*). He was not prescribed any medication as a result of the accident but has been taking Motrin since 2001 to relieve the pain. (R. at 172). Plaintiff also has asthma, for

3

which he must often use his nebulizer and has been prescribed Albuterol.[3] (R. at 169, 176). Plaintiff has a history of diagnosed mental illnesses: mood swings, anxiety and depression. He is currently taking the following prescriptions to combat these problems; Depakote,[4] Seroquel,[5] and Lexapro.[6] (R. at 182). In the past, he had been prescribed Wellbutrin[7] and Zoloft[8], but was later taken off of these medications. (R. 194).

Plaintiff began attending regular Psychiatric Evaluations every few months with Dr. Hai Wei Wang at Westmoreland Comprehensive Counseling Center in May of 2008. (R. at 215, 217, 220, 223, 260, 263, 265, 266). The records indicate that his mother accompanied him to all of his sessions. (*Id.*). During these evaluations, Plaintiff always maintained fair eye contact and exhibited, at least, fair grooming. (*Id.*). He was never noted by Dr. Wang to have any impulse control problems, and he usually portrayed a goal-oriented thought process. (*Id.*). At each session, Plaintiff denied having any suicidal or homicidal thoughts. (*Id.*). Additionally, Dr. Wang never indicated that Plaintiff displayed evidence of hallucinations, delusions or obsessions. (*Id.*).

At these sessions, the following observations were noted by Dr. Wang:

- May 1, 2008 – Plaintiff had stopped attending school because of the cost, and it was noted that his cognition was grossly intact. (R. at 224).

---

[3] Albuterol is used to prevent and treat wheezing, difficulty breathing and chest tightness caused by lung diseases such as asthma and chronic obstructive pulmonary disease. It relaxes and opens the air passages to the lungs to make breathing easier. *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000355/(last viewed on Jan. 14, 2013)

[4] Depakote is the brand name for Valproic Acid, which is used to treat mania in people with bipolar disorder. It works by increasing the amount of a certain natural substance in the brain. PubMed Health, Valproic Acid, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000677/(last visited Jan. 14, 2013).

[5] Seroquel is the brand name for Quetiapine, which is used to treat the symptoms of schizophrenia, mania or depression in patients with bipolar disorder. It works by changing the activity of certain natural substances in the brain. *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001030/(last visited Jan. 14, 2013).

[6] Lexapro is the brand name for Escitalopram, which is used to treat depression and general anxiety disorders. It works by increasing the amount of serotonin in the brain to help maintain mental balance. a*vailable at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000214/(last visited Jan. 14, 2013).

[7] Wellbutrin is the brand name for Bupropion, which is used primarily to treat depression. It works by increasing certain types of activity in the brain. *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000970/(last viewed on Nov. 25, 2012).

[8] Zoloft is a brand name of Sertraline, which is used to treat depression, panic attacks, social anxiety disorders and other disorders. It works by increasing serotonin in the brain to help maintain mental balance. *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001017/(last viewed on Jan. 14, 2013).

- August 23, 2008 – Plaintiff's mood was stable even though he had recently lost his financial aid for ITT Tech, and denied feeling angry, sad or irritated at the time. (R. at 223). This was the only session where he portrayed a coherent thought process, as opposed to goal-oriented thinking, but he still exhibited a grossly intact cognition. (*Id.*). Dr. Wang assigned Plaintiff a GAF score of 60.[9] (*Id.*).

- February 13, 2009 – Plaintiff continued feeling anxious and requested a prescription for Xanax, but decided against it after Dr. Wang discussed its side effects. (R. at 220). At this session, Plaintiff had retardation in his motor ability, a restricted affect, was anxious and had an abnormal speech pattern. (*Id.*). These problems led Dr. Wang to assign a score of GAF 50. (*Id.*).

- April 15, 2009 – It appeared that Plaintiff's anxiety was getting slightly better following his use of Seroquel. (R. at 217). He still showed retardation in his motor ability, anxiety, a restricted affect and abnormal coarse speech. (*Id.*). Dr. Wang concluded that Plaintiff's GAF score was 55. (*Id.*).

- June 5, 2009 – Plaintiff's mother asked why he was not viewed as permanently disabled. (R. at 215). She believed that if he were, it would increase his chance of being approved for SSI. (*Id.*). He returned to having a normal motor and a better mood, but he still maintained a restricted affect and a grossly intact cognition. (*Id.*). Dr. Wang assigned a GAF score of 55-60. (*Id.*).

- October 23, 2009 – Plaintiff identified his anxiety problem, for which he was prescribed Depakote. (R. at 266). He also complained to Dr. Wang about the problem with the bully in his neighborhood. (*Id.*). He had psychomotor retardation, a restricted affect, patterned speech and abnormal insight cognition. (*Id.*).

- January 13, 2010 – Plaintiff's anxiety was making it difficult for him to sleep throughout the night. (R. at 265). He said that cannabis was the only thing that could relieve this anxiety. (*Id.*). He showed catatonic behavior symptoms and abnormal insight, but did exhibit normal motor ability, appropriate affect and a coherent thought process. (*Id.*).

- April 9, 2010 – It appeared as though Plaintiff was doing fine on his medication without side effects and was described as alert and oriented. (R. at 263). He still had a grossly intact cognition and restricted affect, but had normal speech, impulse control, motor ability and behavior. (*Id.*).

- September 14, 2010 – Again his mother wanted him to be placed on SSI and asked why he could not be marked as permanently disabled. (R. at 260). She stated that she intended to care for her son the rest of her life. (*Id.*). He once again showed abnormal insight and restricted affect, but there was no change in his mental status otherwise since the previous session. (*Id.*).

---

[9] The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 34 (4th ed.2000). A GAF score of 40 may have "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood." *Id.* An individual with a GAF score of 41-50 may have "[s]erious symptoms (e.g., suicidal ideation ....)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.* "A GAF of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.*

Dr. Wang approved Plaintiff's Employability Assessment Forms for two separate periods of temporary disability: May 18, 2009 through November 18, 2009, (R. at 290-291), and April 29, 2010 through October 29, 2010. (R. at 292-293). Dr. Wang also included a Health Sustaining Medication Assessment Form with the 2009 Form, which stated that Plaintiff required medication to sustain employment. (R. at 294). Without this medication, Plaintiff would suffer from irregular moods, auditory hallucination and poor concentration and be incapable of working. (*Id.*). Both disability approvals were based upon a review of Plaintiff's medical records and clinical history which diagnosed him with Bipolar disorder and Anxiety disorder NOS. (R. at 290-293). Dr. Wang would later approve Plaintiff for permanent disability on March 4, 2011. (R. at 311).

While being seen by Dr. Wang, Plaintiff was admitted to Excela Health Westmoreland Hospital inpatient psychiatric unit for voluntary treatment on October 17, 2009 until October 20, 2009. (R. at 268). During his treatment, he was monitored by Dr. Gowri Arul. (*Id.*). Prior to admission, Plaintiff had been off of his medication for two months and had become increasingly depressed with mood swings, hopelessness, agitation, and suicidal thoughts of cutting his wrists. (*Id.*). He had been stressed because his disability had been denied and he had grown especially fearful of the bully in his neighborhood. (*Id.*). He was feeling anxious and easily got frustrated, but denied any auditory hallucinations. (*Id.*). Following treatment, hospital discharge records indicate that during his admission, Plaintiff restarted his Depakote medication and he responded very well by calming down. (R. at 269). Because his mother had obtained the PFA against the neighbor who had been bothering him, he was also no longer fearful of going home. (*Id.*). He denied having any suicidal ideations or intentions, and his mood became stable. (*Id.*). As a result of his observations, Dr. Arul assigned Plaintiff a GAF score of 50. (*Id.*).

On June 11, 2009, Dr. John Last performed a consultative examination of Plaintiff. (R. at 194-197). Dr. Last described Plaintiff as a pleasant, cooperative young man whose speech is clear, soft-spoken, and articulate, with coherent, logical and goal directed thoughts. (R. at 195). However, his affect was flat and mood depressed. (*Id.*). He did not have suicidal or homicidal ideations nor any obsessions, compulsions, delusions or psychosis. (R. at 196). Dr. Last found moderate problems in his ability to understand, remember and carry out detailed instructions. (*Id.*). Plaintiff was found to only have slight difficulties being able to understand and remember short, simple instructions; carry out short, simple instructions; and make judgments on simple work related decisions. (*Id.*). He only had moderate difficulty understanding and remembering detailed instructions; carrying out detailed instructions; and interacting appropriately with the public. (*Id.*). Plaintiff was denoted as marked ability in interacting appropriately with supervisors and coworkers. (R. at 197). This examination led to the determination that Plaintiff could not manage benefits in his own interest (*Id.*). Further, he was diagnosed with a GAF of 45, after having been assessed with a score of 55 the previous year. (R. at 195).

On November 4, 2010, Lindsey Groves, Ph.D., evaluated Plaintiff and completed a Physician's Report and Mental Impairment Questionnaire at Kreinbrook Psychological Services. (R. at 296). Dr. Groves diagnosed Plaintiff with Major Depressive Disorder, Impulse Control Disorder, NOS, general anxiety disorder, but ruled out borderline intellectual functioning. (R. at 296). Her report detailed Plaintiff's past, including: his assault of his mother in 1997; killing cats when he was younger; chasing his step-father with an ax at a young age; and attending out-patient therapy since 1997. (R. at 296-97). She stated the Plaintiff lacked insight, exhibited poor judgment (R. at 297), and found him to be 100 percent disabled. (R. at 298). Due to these limitations and Plaintiff's severe anxiety, depression and personality disorders, she determined

7

that he was incapable of engaging in employment on a regular, sustained, competitive and productive basis. (*Id.*). She noted that Plaintiff has been admitted for in-patient hospitalization 5 or 6 times due to suicide attempts and physical aggression, the most recent being the October 17, 2009 incident. (R. at 300).

In a Mental Impairment Questionnaire, Dr. Groves gave Plaintiff a GAF score of 40. (R. at 299). She described Plaintiff as cooperative with logical thoughts, his mood dysphonic with flat affect and that he lacked complete judgment and had limited insight. (R. at 300). She concluded that Plaintiff had an extreme limitation in maintaining social functioning, a marked[10] restriction of daily living activities and moderate difficulties in maintaining concentration, persistence or pace. (R. at 302). In relation to occupational adjustments, he was found incapable of: relating to co-workers; dealing with the public; using personal judgment; dealing with work stresses; interacting with supervisors; and behaving in an emotionally stable manner. (R. at 304-305). He rated fair in his ability to follow work rules; function independently; maintain attention/concentration; understand, remember and carry out complex job instructions and detailed, but not complex job instructions; relate predictably in social situations; and demonstrate reliability. (*Id.*). Dr. Groves did find that Plaintiff had good ability to understand, remember and carry out simple job instructions and maintain personal appearance. (R. at 305).

A Mental Residual Functional Capacity Assessment and a Psychiatric Review Technique were completed by Dr. John Rohar, a state agency psychologist, on December 2, 2011. (R. at 228). This review was completed for the purpose of determining Plaintiff's capacity to sustain certain activity in a work environment and was based upon Dr. Rohar's examination of the evidence in the file. (*Id.*). He did not find that Plaintiff was markedly limited in any mental

---

[10] Marked is a standard for measuring the degree of limitation. It is greater than moderate but less than extreme. 20 C.F.R. § 404 app. 1(12.00)(C).

activity (R. at 228-229), nor did he have any marked functional limitations. (R. at 242). Plaintiff was found to be moderately limited in his ability to understand, remember and carry out detailed instructions and work in coordination or get along with coworkers. (R. at 228-29). He was also moderately limited in his ability to respond appropriately to supervisors and to changes in the work setting, as well as travel to unfamiliar places or use public transportation. (R. at 229). Dr. Rohar concluded that Plaintiff suffered from Bipolar disorder, anxiety disorder and THC abuse. (R. at 230). He believed that Dr. Last's diagnoses were based upon Plaintiff's subjective complaints that were overestimations of his own symptoms and not any other evidence provided in the reports. (*Id.*). Dr. Rohar concluded that Plaintiff's statements regarding his impairments were only partially credible and that he was capable of competitive work on a sustained basis despite his limitations. (*Id.*). In Dr. Rohar's opinion, Plaintiff was moderately limited in maintaining social functioning and maintaining concentration, persistence or pace and mildly restricted in activities of daily living. (R. at 242). Even though Dr. Rohar was aware that Plaintiff had just completed in-patient treatment (R. at 244), he did not find that Plaintiff had repeated episodes of decompensation, each being of extended duration. (R. at 242).

Also, on December 2, 2011, Dr. N'ghia Van Tran conducted Plaintiff's Physical Residual Functional Capacity Assessment. (R. at 251). It was determined that Plaintiff had the ability to occasionally lift or carry up to 50 pounds and frequently lift or carry 25 pounds. He could stand or walk about six hours during a normal eight hour work day. (R. at 247). Plaintiff was environmentally limited by exposure to extreme cold, heat, wetness, humidity and poorly ventilated areas. (R. at 249). Based upon Plaintiff's statements that his daily activities were significantly limited due to his asthma, Dr. Van Tran found that Defendant's statements concerning the severity of his asthma were only partially credible. (*Id.*). While recognizing that

Plaintiff had one ER visit for acute bronchitis and asthma exacerbation, Dr. Van Tran found that his asthma had otherwise remained stable. (R. at 251).

      C.    *Administrative Hearing*

At the hearing, Plaintiff's primary contention for disability centered on his psychological impairments. (R. at 32). He testified that because of his severe anxiety, depression and personality disorders, he is incapable of being around people and can no longer leave his house. (*Id*.). His inability to deal with the public is one of the reasons that he quit McDonald's. (R. at 39). He claimed that when he is around other people, he gets nervous, agitated, angry and occasionally violent. (R. at 32). These violent episodes have typically involved pushing and shoving, but he does not believe that a violent altercation has happened in about a year. (R. at 33). Due to the last altercation, Plaintiff had been switched from Zoloft to Lexapro. (*Id*.). He believes that this change has not helped with his depression. (R. at 34). When feeling depressed, Plaintiff stays inside and does his best to avoid people. (*Id*.). While at home, Plaintiff primarily is on his computer playing games, and he does not spend much time helping around the house. (R. at 35).

Plaintiff testified that he also suffers from physical pain in his lower back. (R. at 37). Plaintiff contended that he is only able to sit in reasonable comfort for about an hour before he needs to move. (R. at 38). He has trouble getting out of bed in the morning due to this back pain. (*Id*.). When asked if he could stand continuously for a job, he believed that he could only do so for a half an hour at the most before needing rest. (*Id*.). Because he usually does not leave his own house, he was unsure how he would react if he was required to walk for any length of time. (*Id*.). Plaintiff does not have a prescription for his back pain, but he does take over the counter medication. (R. at 37). He further claimed that he has trouble lifting because his left arm is

"messed up," although it was never examined. (R. at 38). Plaintiff also complained of his asthma problem, including episodes requiring him to go to the hospital. (R. at 31). When his asthma is acting up, he must use a nebulizer for up to five minutes, two or three times a day. (R. at 37).

Following Plaintiff's testimony, the Vocational Expert was examined by the ALJ to determine the jobs which may possibly be available in the current economy to the hypothetical person of Plaintiff's age, education and work experience. (R. at 41). Further relevant factors included the ability to do medium exertional level work, lift and carry 50 pounds occasionally or 25 pounds frequently, and being able to stand and walk six hours of an eight hour work day.  In addition, the ALJ stipulated that the hypothetical person should not be permitted to use ladders, ropes or scaffolds, cannot be exposed to extreme heat, cold, humidity or wetness, pulmonary irritants such as fumes, odors, dust, gases or chemicals, or subjected to hazardous conditions such as unprotected heights or dangerous machinery. (*Id*.). Furthermore, the hypothetical person was limited to simple, routine tasks involving simple, short instructions and work related decisions with few work place changes without rapid production with pace or assembly line work. Said hypothetical person was also limited to occasional interaction with the public, co-workers and supervisors. (R. at 41-42). To this inquiry, the vocational expert replied that such a person would best be suited as a stock inventory clerk, for which there were 105 positions available in Westmoreland and Allegheny counties and 36,500 on the national level. (R. at 42). All other possible jobs were excluded due to Plaintiff's asthma because he would be incapable of coping with environmental limitations. (*Id*.).

When decreasing the lifting limitation to only twenty pounds occasionally, and ten pounds frequently, the Vocational Expert suggested work as a routing clerk/mail sorter, which offers 170 positions locally and 28,000 nationally; an inspector/packer, which offers 80 positions

locally and 11,800 nationally; and a light, unskilled, entry-level floor worker, that offers 75 positions locally and 10,300 nationally. (R. at 43-44). If this same hypothetical person did not have a driver's license and was sedentary, then that person could work as a product inspector, which has 180 positions locally and 31,650 nationally; a final assembler, which offers 576 locally and 95,800 nationally; or an ampoule sealer, that offers 80 positions locally and 10,500 nationally. (R. at 44). If this hypothetical person could not stay on task at least 90% of the time or were to miss greater than 4-10 days per year, then that person would be terminated and not fit for any occupation. (R. at 45). Moreover, if the person had no ability to relate to co-workers or interact with supervisors, he would not be employable because employees in any position must at least occasionally interact with supervisors. (R. at 46).

## IV.     STANDARD OF REVIEW

To be eligible for social security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. § 423(d)(1)(A); *Brewster v. Heckler*, 786 F.2d 581, 583 (3d Cir. 1986). When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his

past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)[11], 1383(c)(3)[12]; *Schaudeck v. Comm'r of Soc. Sec.*, 181 F. 3d 429, 431 (3d Cir. 1999). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the commissioner is based; the court will review the record as a whole. *See* 5 U.S.C. §706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Burns v. Barnhart*, 312 F.3d 113, 118 (3d Cir. 2002).

"Substantial evidence is defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Ventura v.*

---

[11] Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action … brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business.

42 U.S.C. §§ 405(g).

[12] Section 1383(c)(3) provides in pertinent part:

> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

*Shalala*, 55 F. 3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson*, 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp*., 332 U.S. 194, 196-97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196-97. Further, "even where this court acting *de novo* might have reached a different conclusion … so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F. 2d 1185, 90-91 (3d. Cir. 1986).

## V.    DISCUSSION

Although the ALJ concluded that Plaintiff suffers from severe impairments (e.g., asthma, bipolar disorder, anxiety disorder, and cannabis abuse) it was determined that his impairment or combinations of impairments are only mildly restricting of his daily living activities. (R. at 12). The ALJ believed that Plaintiff's alleged symptoms could result from his impairments, but did not find that their effects are as intense, persistent and limiting as the claimant describes. (R. at 16). As a result, the ALJ determined that Plaintiff has the residual functional capacity to perform light work, but must avoid exposure to extreme heat, cold, humidity or wetness; exposure to pulmonary irritants such as fumes, odors, dust, gases; exposure to hazardous conditions, such as unprotected heights or dangerous machinery. (*Id*.). In addition, Plaintiff was limited to simple,

14

routine tasks involving no more than simple, short instructions and simple, work-related decisions with few work place changes; cannot perform work at production-rate pace; and may have no more than occasional interaction with the public, co-workers and supervisors. (*Id.*). Plaintiff contends that the ALJ erred in five ways. He asserts that the ALJ:

> (1) erred by giving Plaintiff's treating psychiatrist, Dr. Wang's mental impairment opinions little weight;
> (2) erred by failing to address Plaintiff's low GAF scores;
> (3) erred by failing to properly assess and/or to include Plaintiff's poor concentration limitation in his hypothetical questions to the vocational expert;
> (4) erred by improperly relying on the non-examining State Agency Psychologist's opinions of John Rohar, Ph.D; and
> (5) did not base his decision upon substantial evidence

(Docket No. 9 at 3). Defendant argues in its Motion for Summary Judgment that the ALJ's decision that Plaintiff could perform a limited range of light work and that Plaintiff's subjective complaints were not entirely credible, are supported by substantial evidence. (Docket No. 11 at 9, 13).

     A.    *Weighing of Dr. Wang and Dr. Rohar's Opinions*

Plaintiff first contends that the ALJ improperly placed too little weight upon the disability opinion of his treating physician, Dr. Wang and gave too much weight to the opinion of Dr. Rohar, the state agency examiner. (Docket No. 9 at 3). Plaintiff is correct that "[a] cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on a continuing observation *over a prolonged period of time*." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (citations omitted) (emphasis added). The opinions of a treating physician merit greater weight because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical

findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001) (citing 20 C.F.R. § 404.1527(d)(2)). However, a treating physician's opinion will only be given controlling weight where it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." *Fargnoli*, 247 F.3d at 43 (alteration in original) (quoting 20 C.F.R. § 404.1527(d)(2)).

If the treating physician's opinion conflicts with that of a non-treating physician, "the ALJ may decide whom to credit but cannot reject evidence for no reason or for the wrong reason." *Morales,* 225 F.3d at 317. Although treating and examining physician opinions often deserve more weight than the opinions of doctors who merely review records, *see, e.g.*, 20 C.F.R. § 404.1527(d)(1)-(2), "[t]he law is clear ... that the opinion of a treating physician does not bind the ALJ on the issue of functional capacity." *Brown v. Astrue*, 649 F.3d 193, 197 n. 2 (3d Cir. 2011). State agency opinions merit significant consideration as well. *See* SSR 96–6p ("Because State agency medical and psychological consultants ... are experts in the Social Security disability programs, ... 20 C.F.R. §§ 404.1527(f) and 416.927(f) require [ALJs] ... to consider their findings of fact about the nature and severity of an individual's impairment(s)...."); *see also Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011).

Plaintiff presents this challenge based upon Dr. Wang's diagnosis that Plaintiff could not work in any capacity without his medication because he would suffer from irregular mood, auditory hallucination and poor concentration. (Docket No. 9 at 11; R. at 294). Dr. Wang, Plaintiff's treating physician who examined him over a period of time, twice concluded that Plaintiff was temporarily disabled (R. at 291, 293), and more recently, asserted that Plaintiff was permanently disabled. (R. at 311). As discussed earlier, Dr. Wang's opinions were found to be

inconsistent with the record by the ALJ and therefore, these opinions were given little weight. It was explained that Dr. Wang's prognosis was given little weight because it had only been based upon a review of Plaintiff's records as opposed to an examination. (R. at 18). Further, in support of his conclusion, the ALJ stated that there was sufficient evidence in the record to indicate that Plaintiff did not display signs of delusions, hallucinations or thought disturbance. (*Id.*).

Initially, the Court notes that the ALJ mischaracterized the relationship between Dr. Wang and Plaintiff. To this end, the ALJ inaccurately stated that less weight was given because the opinions were based only upon a review of the records. In fact, Dr. Wang had seen Plaintiff regularly as his treating psychiatric physician for over two years. (R. at 18). However, Dr. Wang's determinations that Plaintiff is disabled are only noted by listing his primary diagnosis in the Employability Reassessment Forms approving Plaintiff's disability. (R. at 291, 293, 311). There is substantial evidence to support the ALJ's conclusion that Dr. Wang's findings of delusions and hallucinations were not supported by other evidence in the record—specifically, Dr. Wang's own Westmoreland Comprehensive Counseling Center Psychiatric Evaluation Reviews. During these documented visits that spanned from May 1, 2008 until September 14, 2010, Dr. Wang never noted Plaintiff to exhibit hallucinations or delusions. (R. at 213-224, 260-266). Indeed, during the sessions on April 15, 2009, (R. at 217), and June 5, 2009, (R. at 215), both within a month of Dr. Wang's Reassement Form, there were no indications of hallucinations or poor concentration. Thus, Dr. Wang's professional conclusions are inconsistent with other substantial evidence in the record—his own reports.

Although Dr. Rohar was a non-examining psychologist, he is a state agency psychologist and his opinion was given substantial weight because it was fairly consistent with the record as a whole and the ALJ's impressions of the Plaintiff at the hearing. (R. at 18). The ALJ agreed that

Plaintiff displayed moderate limitation in his ability to maintain activities, to maintain social functioning, and had moderate limitations concerning his employability. (*Id*.). The ALJ reported that Plaintiff is able to take care of his needs independently and use the computer extensively. (*Id*. at 16). Additionally, Plaintiff's use of medication has worked to varying degree. There has been no indication that Plaintiff suffers any side effects nor has his medications or dosages been frequently changed as a result of ineffectiveness or side effects. (*Id*.). Thus, the ALJ has provided substantial evidence to support his determination that Dr. Wang's opinion of permanent disability should be given little weight, while Dr. Rohar's opinion was weighed appropriately.

B.      *Failure to Include Plaintiff's Poor Concentration in Hypothetical*

Plaintiff next asserts that the ALJ did not account for Plaintiff's poor concentration in his hypothetical question. (Docket No. 9 at 13). The "[t]estimony of vocational experts in disability determination proceedings typically includes, and often centers upon, one or more hypothetical questions posed by the ALJ to the vocational expert." *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984). "The ALJ will normally ask the expert whether, given certain assumptions about a claimant's physical capability, the claimant can perform certain types of jobs, and the extent to which such jobs exist in the national economy." *Id*. Although "the ALJ may proffer a variety of assumptions to the expert, the expert's testimony concerning alternative employment may only be considered for purposes of determining disability if the question accurately portrays the claimant's individual physical and mental impairments." *Id*.; *see also Burns v. Barnhart*, 312 F.3d 113, 123 (3d Cir. 2002). If a hypothetical question does not exhibit all of a claimant's impairments found in the record, "the question is deficient and the expert's answer to it cannot be considered substantial evidence." *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987). This Court has held that moderate difficulty sustaining concentration is addressed in a

hypothetical where the question includes that the individual "was limited to simple, routine, repetitive tasks not performed in a fast paced environment, involving only simple work related decisions." *Gilroy v. Astrue*, 2008 WL 4790734 (W.D.Pa 2008), *aff'd* 351 F. App'x. 714 (3d Cir. 2009); *see also McDonald v. Astrue*, 293 F. App'x. 941, 946–47 (3d Cir. 2008) (limiting hypothetical claimant to "simple, routine tasks" accounted for the finding of moderate limitations in concentration).

Here, the hypothetical posed by the ALJ included identical language to the questions upheld in *Gilroy*. The ALJ supplied the vocational expert with the following hypothetical:

> If you would consider a hypothetical person the claimant's age, education, and work experience… Further this hypothetical person should be limited to simple, routine tasks involving no more than simple, short instructions, simple work related decisions with few work place changes, there should be no rapid production with pace or assembly line type work, further the hypothetical person would be limited to occasional interaction with the public, occasional interaction with co-workers, and occasional interaction with supervisors. Based upon those limitations, would there be jobs available that you could cite to?

(R. at 41-42). Plaintiff concludes that the hypothetical posed by the ALJ to the vocational expert should have included that Defendant suffers from a poor concentration impairment (Docket No. 9 at 13), which was diagnosed by Dr. Wang in his Employability Reassessment Forms. (R. at 294). However, those forms concluded that Plaintiff would only suffer from poor concentration if he were to be without his medication. (*Id*.). Plaintiff had been found to suffer from concentration difficulties with other medical sources as well, but to a lesser extent. Dr. Groves, who concluded that plaintiff is 100% disabled, found that he only had moderate difficulties in maintaining concentration, persistence or pace (R. at 302), as did Dr. Rohar. (R. at 242). Additionally, the ALJ recognized Plaintiff is capable of maintaining his concentration for long periods of time given that he is on his computer all day. (R. at 16). Therefore, based upon those

physician's reports along with the ALJ's own impressions at the hearing, the Court finds that the ALJ had substantial evidence to find that Plaintiff only suffered from a moderate limitation in maintaining concentration. This limitation was accounted for in the hypothetical question posed to the vocational expert by restricting Plaintiff to employment which includes only "simple, routine tasks … simple work related decisions with … no rapid production." (R. at 41-42); *Gilroy*, 2008 WL 4790734.

Additionally, Plaintiff argues that the ALJ improperly found that Plaintiff was not credible because he relied upon his own findings and impressions of Plaintiff by noting that he responded to all the questions posed to him at the hearing in an appropriate manner without lapses of concentration. (Docket No. 9 at 14). "Although an ALJ may consider his own observations of the claimant and this Court cannot second-guess the ALJ's credibility judgments, they alone do not carry the day and override the medical opinion of a treating physician that is supported by the record." *Morales v. Apfel*, 225 F.3d 310, 318 (3d Cir. 2000). "The ALJ cannot … disregard [] medical opinion based solely on his own 'amorphous impressions, gleaned from the record and from his evaluation of [the claimant]'s credibility.'" *Id*. (citing *Kent v. Schweiker*, 710 F.2d 110, 115 (3d Cir. 1983)). "The principle that an ALJ should not substitute his lay opinion for the medical opinion of experts is especially profound in a case involving a mental disability." *Morales*, 225 F.3d at 319.

It was the ALJ's duty to weigh the evidence and he could only reject a treating physician's opinion on the basis of contradictory evidence and "not due to his own credibility judgments, speculation or lay opinion." *Id*. at 317. Moreover, under the applicable regulations, the ALJ may consider Plaintiff's daily activities as a valid factor when determining the reliability of the claimant's subjective complaints. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). The ALJ's

own finding that Plaintiff had moderate difficulties maintaining concentration, persistence or pace was not based merely upon his own credibility judgment, but the previously stated evidence that is contradictory to Dr. Wang's conclusions present in the record.

The ALJ's explanation of his credibility determination provides substantial analysis as to why he found Plaintiff not fully credible. After reviewing the ALJ's analysis, the Court finds that the ALJ's hypothetical question was appropriate and was supported by substantial evidence.

C.       *Omission of GAF Scores*

Plaintiff further contends that the ALJ erred by failing to discuss GAF scores that had been assigned to Plaintiff at various times by a number of medical sources. (Docket No. 9 at 10-11). The Social Security Administration's rules note that GAF remains the scale that is used by mental health professionals to "assess current treatment needs and provide a prognosis." 66 Fed.Rg. 50746, 50764-65 (2000); *Pounds v. Astrue*, 772 F. Supp. 2d 713, 725 (W.D. Pa. 2011). "As such, it constitutes medical evidence accepted and relied upon by a medical source and must be addressed by an ALJ in making a determination regarding a claimant's disability." *Pounds*, 772 F.Supp.2d at 725 (quoting *Colon v. Barnhart*, 424 F.Supp.2d 805, 812 (E.D.Pa. 2006). However, the SSA has explicitly declined to endorse the use of the GAF scale because there is no "direct correlation to the severity requirements of the ... mental disorder listings." 66 Fed.Reg. 50746, 50764–65, (2000); *see also Gilroy*, 351 Fed.Appx. at 715–16 (holding that a "GAF score does not have a direct correlation to the severity requirements of the Social Security mental disorder listings.").

"[A] GAF score, without evidence that it impaired the ability to work, does not establish an impairment." *Coy v. Astrue*, 2009 WL 2043491 (W.D.Pa 2009) (citing *Chanbunmy v. Astrue*, 560 F. Supp. 2d 371, 383 (E.D.Pa. 2008)). Further, the ALJ need not discuss every GAF

score, so long as the ALJ conducts an analysis of all relevant medical evidence. *Coy*, 2009 WL 2043491 *8. Additionally, the Court will not remand simply to insert the missing GAF score into the opinion. *Id*. However, remand may be appropriate if it is found that the ALJ is "cherry-picking" or ignoring GAF scores and medical assessments that conflicted with his finding. *See Rios v. Commissioner of Social Sec.*, 444 F. App'x. 532 (3d Cir. 2011) (holding that ALJ's omission to address two GAF scores of 50 was not "cherry-picking" even though the ALJ discussed other, higher GAF scores); *see also Pounds*, 772 F. Supp. 2d at 726 (remanded ALJ's decision to explain consideration of Plaintiff's low GAF scores because ALJ had focused only on positive portions of the medical reports).

In *Gilroy v. Astrue*, the claimant suffered: bipolar disorder; major depression disorder; social anxiety that limits his ability to interact with the public; and other similar moderate limitations. *Gilroy*, 351 F. App'x. at 716. The ALJ followed the proper five-step analysis. *Id*. He repeatedly referenced the observations from the physician's report, while explaining his views on Gilroy's social and occupational functioning. *Id*. Additionally, the ALJ's decision was supported because he recognized the claimant's difficulty interacting with supervisors, coworkers and the public. *Id*. On appeal, the Court found that the ALJ did not err by omitting a physician's one time low GAF rating because the ALJ's disability determination was supported by substantial evidence. *Id*.

In this case, the record indicates that Plaintiff has received the following GAF scores: 40 on 11/4/10 by Dr. Groves, (R. at 299); 45 on 6/11/09 by Dr. Last, (R. at 195); 50 on 9/20/09 by Dr. Arul; and 60 on 8/23/08, (R. at 223), 50 on 2/13/09, (R. at 220), 55 on 4/15/09, (R. at 217), and 55-60 on 6/5/09 by Dr. Wang. (R. at 215). As is noted above, a GAF score between 41-50

may indicate serious symptoms, while GAF scores above 51 show moderate symptoms.[13] When considering Plaintiff's disability claim, the ALJ followed the five-step analysis, and clearly referenced and explained both the positive and negative conclusions from the record concerning the severity of Plaintiff's impairments. (R. at 17-18). The ALJ recognized that Plaintiff has "displayed mood swings; poor attention; depression; anxiety; and feelings of hopelessness." (R. at 14). He also accounted for Plaintiff's brief inpatient treatment due to increased depression and suicidal ideation related to Plaintiff's stopping of his prescribed medication. (R. at 14, 17). The ALJ then went through each of Plaintiff's treating sources, explaining their medical opinions, and how they were weighed. (R. at 17, 18).

Based upon the Third Circuit Court of Appeal's precedent set forth by *Gilroy*, the Court finds that the ALJ did not err by failing to address each of the GAF scores. Plaintiff suffers from very similar impairments as the claimant in *Gilroy*.[14] The ALJ properly followed the five-step analysis, clearly explaining each source's medical opinion and why he either found it persuasive or did not. Additionally, it cannot be said that the ALJ was "cherry-picking" around each physician's negative GAF scores, as the higher scores Plaintiff received were likewise not referenced. Although the ALJ does not address the actual GAF scores, the ALJ clearly considered each of the attendant reports pertaining to Plaintiff's mental impairments. (R. at 18).[15]

The ALJ did not specifically discuss Dr. Arul's GAF score in his opinion; however Dr. Arul did write Plaintiff's discharge summary showing inpatient treatment, which the ALJ

---

[13] *See* note 9, *supra*.

[14] Although Plaintiff also suffers from asthma, a GAF score reflects mental health illness, not physical illnesses. American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 34 (4th ed. 2000).

[15] This case is distinguishable from this Court's previous decision which remanded the ALJ's decision because he failed to mention GAF scores. *Metz v. Astrue*, 2010 WL 3719075 (Sept. 17, 2010). In *Metz*, the ALJ did not just omit the GAF scores, but also erroneously mischaracterized the evidence and relied on factual inaccuracies. *Id.* at 12. Primarily, Metz had two separate week long in-patient admissions in his medical records, one of which was inaccurately portrayed and the other was completely ignored by the ALJ. *Id.* The case was remanded for the ALJ to more accurately review the plaintiff's record and provide additional reasoning for his disability decision. *Id.*

recognized repeatedly in his determination. The ALJ referenced that Plaintiff sought treatment for three days as a result of increased depression and suicidal ideation. (R. at 14). From the report, it was noted that Plaintiff had been feeling hopelessness and anxiety, but was also not on his medication at the time of treatment and responded favorably once his medication restarted. (R. at 269). Even though the ALJ did not discuss the GAF score, he did discuss all the other relevant medical evidence provided by Dr. Arul. *Coy*, 2009 WL 2043491 *8. Thus, the ALJ's decision is supported by substantial evidence.

        D.     *Substantial Evidence*

Last, Plaintiff maintains that the ALJ's determination that he was capable of performing simple, routine job tasks was not based upon substantial evidence. (Docket No. 9 at 14). Plaintiff supports this assertion with Dr. Wang's Employability Assessment Form, which indicated that Plaintiff is permanently disabled. Dr. Wang's form, dated March 4, 2011, diagnoses Plaintiff with bipolar disorder as well as anxiety disorder NOS, and references his fourteen year period of unemployment. (R. at 311). These conclusions were based upon a review of medical records and clinical history. (R. at 15). For the ALJ's decision to be supported by substantial evidence, there must be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Ventura*, 55 F. 3d at 901.

The ALJ has identified sufficient evidence in the record that supports his conclusion that Plaintiff has the ability to perform light work. Plaintiff has reported that he stays on his computer all day (R. at 167), cares for pets (R. at 164), and takes care of his own personal needs, including his personal finances. (R. at 166). Plaintiff had previously reasoned that he was good at following written instructions and was "ok somewhat" at following spoken instructions. (R. at 168). He also believed that he could get along well with authority figures. (R. at 169).

Furthermore, the record supports the ALJ's conclusion that Plaintiff displayed clear and articulate speech; coherent, logical and goal directed thoughts; no suicidal or homicidal ideations; and no obsessions, compulsions, delusions or evidence of psychosis. The ALJ also observed Plaintiff's ability at the hearing to respond appropriately with no overt lapses in concentration and engage in no inappropriate social behavior. (R. at 14).

Additionally, there is substantial evidence to support the ALJ's conclusion that Plaintiff is capable of work due to his mental impairments by examining Plaintiff's successful use of his prescribed medication. (R. at 16). It was noted that the claimant has not reported any side effects from the medication nor has his medication been frequently changed due to ineffectiveness or side effects. (R. at 263). Plaintiff alleges that the medication does not help; however, when he was not taking it, he was admitted for inpatient treatment due to increasing depression and suicidal ideation. (R. at 268). Once Plaintiff was placed back on his medication, he was released after three days of treatment. (*Id.*). Since October of 2009, he has not required any more emergency treatment. The Court, therefore, agrees that the ALJ's determination that Plaintiff responds favorably to his medication and is capable of simple, routine job tasks, is supported by substantial evidence.

Finally, both of the state agency evaluators that examined Plaintiff found that he was capable of gainful employment. Dr. Rohar, the state agency consultant who reviewed Plaintiff's functional capacity, found that he could "meet the basic demands of competitive work on a sustained basis despite the limitations resulting from his impairments." (Tr. at 230). Dr. Van Tran, another state agency consultant, found that Plaintiff's physical limitations were not as significant as Plaintiff described them. (Tr. at 251). These consultants are experts in the Social Security disability programs and their opinions are supported by evidence in the record.

*Chandler*, 667 F.3d at 361. Thus, the ALJ's reliance on their opinions was warranted and supports the ALJ's conclusion that Plaintiff was capable of employment.

## VI.    CONCLUSION

Based upon the foregoing, the decision of the ALJ is supported by substantial evidence in the record. Reversal or remand of the ALJ's decision is not appropriate. Accordingly, Plaintiff's Motion for Summary Judgment is denied (Docket No. 8), Defendant's Motion for Summary Judgment is granted (Docket No. 10), and the decision of the ALJ is affirmed. Appropriate Orders follow.

*s/ Nora Barry Fischer*
Nora Barry Fisher
United States District Judge

Dated: January 25, 2013
Cc/ecf: All counsel of record.